DSS/JDG:SDD/SPN
F.#2013R00278

13 M 759

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X

UNITED STATES OF AMERICA

   - against -

REX G. MARALIT,
ARIEL MARALIT and
WILFREDO MARALIT,

     Defendants.

- - - - - - - - - - - - - X

<u>TO BE FILED UNDER SEAL</u>

COMPLAINT AND AFFIDAVIT IN
<u>SUPPORT OF ARREST WARRANT</u>

(T. 18, U.S.C., §§ 371,
922(a)(1)(A),
924(a)(1)(D) and 3551
<u>et</u> <u>seq</u>.; T. 22, U.S.C., §§
2778(b)(2) and (c);
T. 22, C.F.R., §§ 120 <u>et</u>
<u>seq</u>.)

EASTERN DISTRICT OF NEW YORK, SS:

     STEVEN R. GOODMAN, being duly sworn, deposes and says

that he is a Special Agent with Homeland Security Investigations

("HSI"), duly appointed according to law and acting as such.

     1.  Upon information and belief, on or about and

between January 1, 2009 and March 5, 2013, both dates being

approximate and inclusive, within the Eastern District of New

York and elsewhere, the defendants REX G. MARALIT, ARIEL MARALIT

and WILFREDO MARALIT, together with others, did knowingly and

willfully conspire to: (a) export from the United States to the

Philippines defense articles, designated on the United States

Munitions List ("USML"), to wit: firearms and firearms

components, including a Barrett M82A1 .50 caliber semi-automatic

rifle, a Remington Model 700 SPS .308 caliber tactical sniper rifle, a P.S.A. 5.56mm semi-automatic rifle, FN SCAR .308 caliber assault rifles, 5.7mm FN Herstal pistols and other firearms and firearms components, without first obtaining the required license or written approval from the State Department, contrary to Title 22, United States Code, Sections 2778(b)(2) and 2778(c) and Title 22, Code of Federal Regulations, Parts 121 and 127; and (b) engage in the business of dealing in firearms, not being licensed importers, licensed manufacturers or licensed dealers of firearms, contrary to Title 18, United States Code, Sections 922(a)(1)(A), and 924(a)(1)(D).

2.   It was part of the conspiracy that the defendants REX G. MARALIT, ARIEL MARALIT and WILFREDO MARALIT, together with others, arranged for the purchase and export of defense articles listed in Categories I(a), I(c), I(g) and I(h) of the USML, including a Barrett M82A1 .50 caliber semi-automatic rifle, a Remington Model 700 SPS .308 caliber tactical sniper rifle, a P.S.A. 5.56mm semi-automatic rifle, FN SCAR .308 caliber assault rifles, 5.7mm FN Herstal pistols and other firearms and firearms components, from the United States to the Philippines without first obtaining an export license from the State Department.

3.   In furtherance of the conspiracy and to effect its unlawful objectives, within the Eastern District of New York and

elsewhere, the defendants REX G. MARALIT, ARIEL MARALIT and WILFREDO MARALIT, together with others, committed and caused the commission of, among others, the following:

<u>OVERT ACTS</u>

a. On or about July 16, 2009, ARIEL MARALIT sent an email to REX G. MARALIT and WILFREDO MARALIT from an internet protocol ("IP") address in the Philippines, with the subject line "buying orders," that listed proposed purchase prices, sale prices, and net profits per person for specified firearms.

b. On or about August 13, 2009, WILFREDO MARALIT submitted a bid to purchase a 5.7mm FN Herstal pistol through an online firearms marketplace.

c. On or about August 14, 2009, WILFREDO MARALIT sent an email to a firearms seller providing contact information for the defendant REX G. MARALIT.

d. On or about December 1, 2011, ARIEL MARALIT sent an email to REX G. MARALIT from an IP address in the Philippines, indicating that he had identified a buyer in the Philippines for a Remington 700 SPS .308 caliber rifle and a Barrett M82A1 .50 caliber semi-automatic rifle.

e. On or about December 1, 2011, ARIEL MARALIT sent an email to REX G. MARALIT from an IP address in the

3

Philippines setting forth how the Barrett M82A1 .50 caliber semi-automatic rifle should be shipped to the Philippines.

f.  On or about December 9, 2011, REX G. MARALIT, together with others, purchased a Barrett M82A1 .50 caliber semi-automatic rifle.

g.  On or about December 19, 2011, REX G. MARALIT traveled to Pennsylvania and took possession of a Barrett M82A1 .50 caliber semi-automatic rifle and a Remington 700 .308 caliber SPS rifle.

h.  On or about December 25, 2011, REX G. MARALIT sent an email to ARIEL MARALIT attaching a copy of a United States Postal Service declaration form and receipt for shipping fees.

i.  In or about December 2012, REX G. MARALIT shipped firearms and firearms components from the United States to the Philippines via John F. Kennedy International Airport ("JFK") in Queens, New York.

j.  On or about February 8, 2013, REX G. MARALIT sent a text message to a licensed firearms dealer in Pennsylvania.

k.  On or about March 5, 2013, WILFREDO MARALIT took possession of a P.S.A. 5.56mm semi-automatic rifle from a licensed firearms dealer in California.

4

(Title 18, United States Code, Sections 371 and 3551 <u>et</u> <u>seq</u>.)

The source of your deponent's information and the grounds for his belief are as follows:[1]

4.    I am currently a Special Agent with HSI, and have served in this capacity since May 2010.  Prior to joining HSI, I served as a special agent with the United States Secret Service from July 2001 to September 2006, and with the Department of Commerce, Office of Export Enforcement from September 2006 to May 2010.  I am currently assigned to the Counter Proliferation Investigations Group at HSI.  My duties include the investigation and enforcement of federal laws involving the unlicensed export of controlled commodities, including certain types of firearms and firearms components.

5.    As an HSI special agent, I have received advanced training at the Federal Law Enforcement Training Center ("FLETC").  In addition, I have conducted and participated in several investigations involving the unlicensed export of U.S. commodities, including firearms and firearms components.

---

[1]    Because this affidavit is being submitted for the limited purpose of establishing probable cause to arrest the defendants, I have not set forth every fact learned during the course of this investigation.

6.    Through my training, education, and experience - which has included (i) reviewing financial records; (ii) conducting surveillance of individuals engaged in the violation of federal law; and (iii) executing search warrants on suspect premises - I have become familiar with the manner in which controlled commodities are unlawfully exported from the United States to foreign countries, directly or indirectly, to avoid both licensing requirements and detection by law enforcement.

7.    I have personally participated in this investigation and have witnessed some of the facts and circumstances described herein.  In addition, I have received information from other federal law enforcement officials, including foreign law enforcement officials.  I also have reviewed documents obtained during the course of the investigation.  The statements contained in this affidavit are based on my own observations as well as the review of documents and reliable information provided to me by other law enforcement personnel.  Where the contents of documents, or the actions, statements and conversations of others are reported herein, they are reported in sum and substance and in part, except where otherwise indicated.  In addition, where foreign language materials are referenced, they are based on summary draft translations, which are subject to revision.

I.   Introduction

8.   Since in or about February 2013, I have been participating in the investigation of the defendants REX G. MARALIT, ARIEL MARALIT, WILFREDO MARALIT and others for possible violations of U.S. export laws, including the unlicensed export of firearms and firearms components, which are regulated by the United States government.  This investigation has revealed that the defendants REX G. MARALIT, ARIEL MARALIT and WILFREDO MARALIT conspired to unlawfully export firearms and firearms components from the United States to the Philippines without first obtaining the necessary export licenses, in violation of 22 U.S.C. § 2778(c).

9.   At all times relevant to the complaint, pursuant to Title 22, United States Code, Section 2778(b)(2), defense articles designated by the President of the United States on the USML may not be exported without a license from the United States Department of State, Directorate of Defense Trade Controls ("DDTC").  In addition, pursuant to Title 22, Code of Federal Regulations, Section 120, et seq., the DDTC is responsible for the administration of the International Traffic in Arms Regulations ("ITAR") as they relate to the manufacture, brokering, import, export, and transfer of defense articles and defense services.  Title 22, United States Code, Section 2778(c)

provides criminal penalties for willful violations of Section
2778.

     10.   Category I of the USML expressly applies to
"Firearms, Close Assault Weapons and Combat Shotguns."  <u>See</u> 22
C.F.R. § 121.1.  Category I(a) of Section 121.1 pertains to
"Nonautomatic and semi-automatic firearms to caliber .50
inclusive (12.7 mm)".  Category I(c) of Section 121.1 pertains to
"Firearms or other weapons (e.g., insurgency-counterinsurgency,
close assault weapons systems) having a special military
application regardless of caliber."  In addition, Category I(g)
of Section 121.1 pertains to "Barrels, cylinders, receivers
(frames) or complete breech mechanisms for the articles in
paragraphs (a) through (d) of this category" and Category I(h)
pertains to "Components, parts, accessories and attachments for
the articles in paragraphs (a) through (g) of this category."
Section 123.1 of the Code of Federal Regulations provides that
"Any person who intends to export . . . a defense article must
obtain the approval of the [DDTC] prior to the export or
temporary import, unless the export or temporary import qualifies
for an exemption under the provisions of this subchapter."  22
C.F.R. § 123.1(a).

II.  <u>Factual Allegations</u>

     11.   This investigation is being coordinated by HSI,

the Defense Criminal Investigative Service ("DCIS"), and the
Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").  To
date, the investigation has revealed that REX G. MARALIT, ARIEL
MARALIT, WILFREDO MARALIT and others have been involved in
acquiring firearms and firearms components for export to the
Philippines in contravention of U.S. export control laws and
regulations.  The types of firearms believed to have been
exported by the defendants and others include, but are not
limited to, the following types of firearms: a Barrett M82A1 .50
caliber rifle; FN SCAR 17 .308 caliber semi-automatic rifles; an
LMT LM .308 caliber semi-automatic rifle; a Knights Armament SR-
15 E3 short-barrel rifle; a Remington Model 700 .308 caliber SPS
bolt-action rifle; a P.S.A. 5.56mm semi-automatic rifle and 5.7mm
FN Herstal semi-automatic pistols.  In addition, the defendants
and others are believed to have exported various types of
firearms components, including 9mm pistol barrels, upper and
lower receivers for semi-automatic rifles and various ammunition
magazines, including Barrett .50 caliber magazines, M4 5.56mm
magazines and high-capacity PS90 5.7mm magazines.

     12.  In or about February 2013, I learned that the
defendants REX G. MARALIT and ARIEL MARALIT were involved in
exporting firearms from the United States to the Philippines from
a confidential source ("CS1") in the Philippines.  Information

provided by CS1 has proven reliable and has been corroborated by other evidence. More specifically, on February 4, 2013 my investigative group received information that CS1 had informed investigators that an individual in the Philippines named ARIEL MARALIT was acting as an unlicensed distributor of firearms and firearms components. CS1 further advised that ARIEL MARALIT had received firearms and firearms components from his brother, REX G. MARALIT, who lives in the United States.

13. Further investigation revealed that the defendant REX G. MARALIT is a naturalized U.S. Citizen with multiple residences in Queens, New York and New Jersey. The defendant ARIEL MARALIT is REX G. MARALIT's brother, who resides in the Philippines. During the course of this investigation, I have learned that REX G. MARALIT is an officer with the New York City Police Department ("NYPD"). I have also learned that a third brother, the defendant WILFREDO MARALIT, is a United States Customs and Border Protection ("CBP") Officer assigned to Los Angeles International Airport in Los Angeles, California. As discussed further below, based on my review of records and interviews with witnesses, I have learned that REX G. MARALIT, ARIEL MARALIT, WILFREDO MARALIT and others have arranged the purchases of numerous firearms and firearms components from U.S. suppliers. Some of these purchases were arranged online using IP

addresses that resolved to the Philippines.  Some of the
shipments of firearms and firearms components were sent from the
United States to the Philippines via JFK.

14.  As set forth in more detail below, I have reviewed
email communications, text messages, bank records, invoices for
firearms and firearms components, shipping records and internet
records indicating that REX G. MARALIT, ARIEL MARALIT, WILFREDO
MARALIT and others have been involved in the purchase and
overseas shipment of firearms and firearms components, and that
some of the purchases were made from and intended for
distribution in the Philippines.  Certain of the invoices and
related documents contain contact information, including email
addresses, for purchasers of firearms and firearms components.

15.  On April 29, 2013, the Honorable Cheryl Pollak,
United States Magistrate Judge in the Eastern District of New
York, issued warrants to search email accounts subscribed to by
the defendants REX G. MARALIT, ARIEL MARALIT and WILFREDO MARALIT
for evidence of U.S. export violations.  I have reviewed the
contents of those email accounts along with the other documentary
evidence described below.

16.  I have also obtained a visa application filed by
the defendant ARIEL MARALIT, which included a photograph of ARIEL
MARALIT.  I have compared that photograph to photographs sent

11

from the email account subscribed to ARIEL MARALIT.  Some of the photographs sent from the e-mail account show ARIEL MARALIT holding firearms, including assault rifles.

17.  In addition, I have obtained records of the defendant WILFREDO MARALIT's course curriculum during his CBP officer training at FLETC.  Based on my review of these records, I learned that WILFREDO MARALIT graduated from CBPI Class 434, and attended training from March 31, 2004 to June 23, 2004. Among the classes WILFREDO MARALIT participated in were "S480, Export Controls and Outbound Enforcement Operations" and "C410, Anti-Terrorism, Risk Targeting, and Trade Processing."  Class S480 included curriculum specifically relating to export controls and license requirements for the export of certain articles.

18.  For example, the student manual for class S480 "presents an overview of export controls and outbound operations" and states that, in determining whether an item requires an export license, the officer should consider "The Product & Intended End Use," noting that "The following types of products and end uses may be subject to export licenses: Sophisticated and high-technology products, Short-supply items, and Technical information and products that have defense, strategic, weapons development, proliferation, or law enforcement applications."  In addition, the manual indicates that "some exports may be subject

12

to controls regardless of the function or the country to which they are shipped, for example, most military items." The manual also states that "To protect our Nation from international terrorism, CBP is the first line of defense to prevent international terrorists and criminal organizations from obtaining weapons-of-mass-destruction materials and technologies, arms, funds, and other support from U.S. and foreign sources."

19. In addition to the specialized export enforcement training that the defendant WILFREDO MARALIT received at FLETC, and based on my experience as a federal law enforcement agent, I know that, during the course of their employment, CBP officers are expected to familiarize themselves with the specific laws and regulations that relate to international shipments and exports of commodities.

A.   FN 5.7mm Pistol and Magazines

20. On July 4, 2009, the defendant ARIEL MARALIT sent an email to the defendant WILFREDO MARALIT with the subject heading "need to find." The email discusses firearms and firearm components, such as a "socom," which, based on my training and experience, I understand to be a type of military-style rifle.

21. That same day, the defendant WILFREDO MARALIT responded to the defendant ARIEL MARALIT, providing several links to online suppliers of firearms and firearms components. For

example, WILFREDO MARALIT discussed a "stock," which I understand to be a component of a rifle.  In addition, WILFREDO MARALIT made reference to "WWW.BOTACHTACTICAL.COM FOR 5.7 AND FN PS90 MAGS." I have visited the website "botachtactical.com," which is a large-scale retailer and distributor of firearms components and military and tactical equipment, such as ammunition magazines, optical sights, and other firearms accessories.  Notably, with respect to each item viewed on the Botach Tactical website, including PS90 magazines, the website informs the viewer in prominent font: "**Please Note**: Some Products We Sell Carry **RESTRICTIONS** In Certain States and Some Products **ARE NOT EXPORTABLE** Under US ITAR Laws.  Buyer Is Responsible For Knowing & Complying With All Local, State, Federal & US Export ITAR Laws" (emphasis and red font color in original).  I have confirmed that the warning banner on the Botach Tactical website appeared on that website during the relevant time frame.

22.  On July 16, 2009, the defendant ARIEL MARALIT sent an email to the defendants REX G. MARALIT and WILFREDO MARALIT from an IP address in the Philippines, with the subject line "buying orders," that listed proposed purchase prices, sale prices and net profits per person, i.e., for each brother, for several firearms, including three 5.7mm FN Herstal pistols.

14

ARIEL MARALIT instructed his brothers to purchase the firearms "asap and send before October."

23.   Based on my training and experience, I know that a 5.7mm round is capable of penetrating police body armor.  In addition, I have learned that the FN Herstal 5.7mm pistol was designed as a battlefield weapon with the capability of penetrating armor worn by military combatants.

24.   On July 17, 2009, the defendant WILFREDO MARALIT responded to the defendant ARIEL MARALIT with a link to information on a 5.7mm pistol provided at the website arizonagunrunners.net.

25.   On August 7, 2009, the defendant ARIEL MARALIT sent an email to the defendant WILFREDO MARALIT referencing an order for "ps90 mag from lonewolf . . . 50rd translucent."  Based on my training and experience, and research during the course of this investigation, I know that "Lone Wolf" is an online distributor of firearms components, including PS90 magazines, and that "50rd" is an abbreviation for "50 rounds," which is the number of cartridges that some PS90 magazines can contain.

26.   The defendant WILFREDO MARALIT replied to the defendant ARIEL MARALIT, stating:

> pls let them know that those mags are korean
> aftermarket mags and I can get original fn
> ps90 30rd. that can easily be converted to

15

> 50rd.by removing the spacer in 2-5 minutes,
> for $49.99 plus tax and shipping . . . .  AKO
> I'LL JUST BUY THE ORIG. 30RD. $49.95 THAT CAN
> EASILY BE CONVERTED TO 50RDS.BY USING THE
> DREMEL TOOL.  THANKS.

27.  On August 9, 2009, the defendant ARIEL MARALIT

sent an email to the defendant WILFREDO MARALIT with the subject

heading "cmag 223" referencing a "cmag . . . clear (see-thru) for

.223."  Based on my training and experience, I know that a "cmag"

is a type of high-capacity magazine, which is sometimes

translucent or transparent to allow the user to view the number

of rounds in the magazine.  In addition, I know that ".223" is a

variation of the 5.56mm military service cartridge for which the

M4 assault rifle and other military-style weapons are chambered.

28.  On August 13, 2009, the defendant WILFREDO MARALIT

received an email from gunbroker.com, an online firearms

marketplace indicating that he had secured the right to purchase

one 5.7mm pistol for $950 through an online auction.

29.  On August 14, 2009, the defendant WILFREDO MARALIT

sent an email to the seller of the 5.7mm pistol stating that the

defendant REX G. MARALIT would be in touch with contact

information for a federally licensed firearms dealer, or Federal

Firearms Licensee ("FFL")[2] in Yonkers, New York.

---

[2] FFLs are authorized by law to engage in, among other things,
the interstate sale and shipment of firearms.

16

30.   On August 14, 2009, the defendant WILFREDO MARALIT sent the defendant ARIEL MARALIT an email in which he stated, "I need the money for the p90 mags and the cmag, pls let me know how u are gonna send it."

31.   The defendant REX G. MARALIT purchased a FN Herstal 5.7mm semi-automatic pistol on August 6, 2009 and had it shipped to an FFL in Yonkers, New York.

32.   On August 18, 2009, the defendant WILFREDO MARALIT sent the defendants ARIEL MARALIT and REX G. MARALIT an email detailing the cost of 2 "Beta C-MAG Package Systems" at $590.00 and "5 FN P90 5.7x28 30 rd" magazines at $249.75, stating "WILL LET YOU KNOW WHEN TO SEND MONEY THRU MY ACCT."  With shipping and tax, the total came to $961.62.

33.   I have also reviewed an emailed receipt from Botach Tactical to the defendant WILFREDO MARALIT dated August 19, 2009, which indicated that two "Beta C-Mag Package Systems" and five "FN P90 5.7x28 30rd" magazines were ordered by "Willie Maralit" at "U.S. CUSTOMS AND BORDER PROTECTION" in Hawthorne, California.  The invoice indicated, "Will Call/For Pick-Up," and that payment was to be made in cash.  As set forth above, when purchasing online from Botach Tactical, each item on the website, including PS90 magazines, includes an explicit warning that

informs purchasers that certain items "**ARE NOT EXPORTABLE** Under US ITAR Laws" (emphasis in original).

B.   Barrett .50 Caliber Semi-Automatic Rifle And Remington 700 SPS Tactical Sniper Rifle Export Transactions

34.   On December 1, 2011, the defendant ARIEL MARALIT sent an email from an IP address in the Philippines (the "December 1, 2011 email") to the defendant REX G. MARALIT, with the subject "re:$ sent", which stated, inter alia, "us7100 charlie orders n us4400 frm ur partial $ here[] I paid us25 for the t/t." Based on my experience and research, I am aware that "t/t" is a reference to "telegraphic transfer," a term associated with monetary wire transfers. Based on my review of bank records, I learned that on December 1, 2011, REX G. MARALIT received a wire transfer into his bank account in the amount of $11,480.00 from a company incorporated in the Philippines.

35.   The December 1, 2011 email also stated, "charlie order: remington 700 sps tact aac-sd 308 hogue rifle and m82 29inch barrel from ohio ord. pls see attached files for reference. need to send partial parts of these asap thru ems . . . . can send it by next wik earliest pls." The attachments to the email include web-postings for the sale of rifles and other firearms. Based on my training and experience, I know that firearms traffickers seeking to avoid detection of unlawful

firearms shipments commonly send components of firearms in separate packages to make detection more difficult.

36.   Among the items listed and depicted in the web postings attached to the December 1, 2011 email are a Remington Model 700 .308 caliber SPS rifle ("Remington rifle"), the features of which include the ability to accept a flash hider, muzzle break and sound suppressor.  The rifle was valued at $605.00.  Based on my research and training, I know that a Remington Model 700 SPS rifle is a bolt action rifle that is designed primarily for tactical applications, such as law enforcement and military use.

37.   The email attachment also included a listing for a "Barrett M82A1 .50 caliber sniper rifle," valued at $6,500, and a new barrel valued at $2,500.  Based on my training and research, I know that the Barrett M82A1 .50 caliber rifle ("Barrett rifle") is an extremely powerful long-range weapon that is in use by U.S. Special Forces and other elite military units.  The .50 caliber round that the Barrett rifle fires is capable of inflicting significant damage.  For example, U.S. military and law enforcement agencies use .50 caliber rifles to disable vehicles. In addition, the .50 caliber round will penetrate most commercial brick walls and concrete cinder blocks, and poses a plausible threat to aircraft.

38.   In addition, with respect to the reference to "ems," I have learned through this investigation that "ems" is a priority mail express international mail service provided by the U.S. Postal Service.

i.   <u>Purchase of The Barrett Rifle</u>

39.   On December 4, 2011, the defendant REX G. MARALIT replied to the December 1, 2011 email, acknowledging the defendant ARIEL MARALIT's query regarding the Barrett rifle and referencing the rifle listed and depicted in the web posting attached to the December 1, 2011 email.

40.   On December 6, 2011, the defendant ARIEL MARALIT sent an email to the defendant REX G. MARALIT that included a web link to a posting on "tombstone tactical" with a reference to a "barrett/m82a1-rifle."   Tombstone Tactical is a national distributor of firearms, which specializes in tactical weapons. REX G. MARALIT replied, stating "tombstone on back order."

41.   Also on December 6, 2011, the defendant REX G. MARALIT sent an email to a private seller in Morgantown, North Carolina ("the private seller"), with the subject line "WTS Barrett 82A1 7900.00," asking "is this still available?"   The private seller replied, "Yessir it is as of this writing."   REX G. MARALIT and the private seller then arranged for REX G. MARALIT to purchase the weapon.

42. That same day, the defendant REX G. MARALIT sent a text message to an FFL in Pennsylvania ("the Pennsylvania FFL"), stating, "good morning! as stated earlier, please send a copy of your FFL to this person [the private seller]. . . . M82a1, got it for a good price and already have a buyer at work :)." The Pennsylvania FFL responded by texting contact information to provide to the private seller.

43. According to email records, on December 9, 2011, the private seller shipped the Barrett rifle to the Pennsylvania FFL via United Parcel Service, and later provided a tracking number to the defendant REX G. MARALIT, via email. On December 9, 2011 REX G. MARALIT drew on funds in his bank account in the amount of $7,910.00 in connection with the issuance of a cashier's check. On December 16, 2011, the Pennsylvania FFL sent a text message to REX G. MARALIT, indicating "Barrett's in."

44. On or about December 19, 2011, the defendant REX G. MARALIT took possession of the Barrett rifle from the Pennsylvania FFL.

ii. Purchase of The Remington Rifle

45. On December 4, 2011, the defendant REX G. MARALIT sent an email to Tactical Edge Firearms, the seller of the Remington rifle, asking whether the Remington rifle was still for sale. The seller confirmed that the rifle was available for $605

21

plus taxes and shipping.  On December 6, 2011, REX G. MARALIT requested contact information for the seller of the Remington rifle to facilitate communication with the Pennsylvania FFL.  On December 6, 2011, the Pennsylvania FFL emailed the seller of the Remington rifle a copy of its license.

46.  On December 7, 2011, the defendant REX G. MARALIT and the Remington rifle seller received email confirmation of a $681.14 transaction charged to a credit card in REX G. MARALIT's name.  Also on December 7, 2011, REX G. MARALIT received an email from UPS confirming shipment of the Remington rifle to the Pennsylvania FFL.

47.  On December 8, 2011, the defendant REX G. MARALIT received an email from UPS confirming receipt of the Remington rifle by the Pennsylvania FFL.

48.  On or about December 19, 2011, the defendant REX G. MARALIT took possession of the Remington rifle from the Pennsylvania FFL.

iii.  Communication With the Pennsylvania FFL and Export Transactions

49.  Based on my training and experience, I know that for each firearm purchase from a federally licensed firearms dealer the ATF requires that the purchaser of the firearm complete a "Form 4473" setting forth the identity of the

purchaser and making certain representations regarding the
transaction.  The form specifically notifies the purchaser that
it is a felony to falsely represent that the purchaser is the
actual buyer when such is not the case.  The form states:
"Warning: You are not the actual buyer if you are acquiring the
firearm(s) on behalf of another person.  If you are not the
actual buyer, the dealer cannot transfer the firearm(s) to you."

50.  I have reviewed an ATF Form 4473 relating to the
purchase of the Barrett rifle and the Remington rifle from the
Pennsylvania FFL on December 19, 2011, on which the defendant REX
G. MARALIT represented that he was the actual buyer of the
weapons.  In addition, REX G. MARALIT provided a copy of his
driver's license, which established his home address in Queens,
New York.  Based on my review of the Pennsylvania FFL's records,
I am also aware that REX G. MARALIT provided the Pennsylvania FFL
with a photocopy of his NYPD identification card, which
identifies REX G. MARALIT as a police officer with the NYPD.

51.  On December 20, 2011, the defendant ARIEL MARALIT
sent an email to the defendant REX G. MARALIT, with the subject
heading "ems instruct."  The email stated: "send to: nathaniel
familara" with an address in the Philippines and a telephone
number with a country code for the Philippines.  The December 20,
2011 email also stated: "industrial sliding door track m82 upper,

23

glock parts." Based on my training and experience, I know that "Glock" is a brand of handgun, and that the term "upper" refers to the upper receiver component of a firearm such as the Barrett rifle.

52. On December 25, 2011, the defendant REX G. MARALIT sent an email to the defendant ARIEL MARALIT attaching documents, including a United States Postal Service Declaration, indicating that a parcel was sent from an individual named "Norman Jose" at an address in New Jersey. Based on my review of REX G. MARALIT's NYPD employment files, I learned that the address listed for "Norman Jose" on the declaration is the same address as a previous employer of REX G. MARALIT. The form showed that the parcel was sent to "Nathaniel Familara," at the address in the Philippines set forth in the email. The weight of the parcel was listed as "24 pounds," with a total purported value of "250." Under "Declared Description of Contents," the form listed "Industrial sliding door track," with a quantity of "2." Based on my research, I have learned that the upper receiver of a Barrett M82A1 rifle weighs approximately 16.5 pounds. Based on my training and experience, I know that firearms traffickers seeking to avoid detection of unlawful firearms shipments commonly list items unrelated to firearms, such as hardware or appliances, on shipping and mailing manifests, and often co-

24

mingle such items with firearms and firearms components in their shipments.

53.   The defendant ARIEL MARALIT forwarded the December 25, 2011 email with the attached Postal form discussed above to a contact believed to be in the Philippines.   IP login information indicates that the forwarded email from ARIEL MARALIT was sent to an email address for an account based in the Philippines.   A review of United States Postal Service Records indicates that the above-referenced parcel arrived in the Philippines on January 3, 2012.

54.   On January 25, 2012, the defendant ARIEL MARALIT sent an email to the defendant REX G. MARALIT with the subject "re: order out."   The email stated:

> ems:
>
> all glock slides, fulton armory parts, sass ar10 upper ( disaassemble [sic] if u can), glock 19 parts
>
> tv and bbox:
>
> m82 remaining parts, rem 700, ar15 barel, dvd player
>
> incoming: barrett mags fulton bare m1a receiver, lmt308mwsf
>
> wait for new names n addresses for ems, the tv n bbox must leave 2 wiks apart n separate parts of units between them.

Based on my training and experience, and research conducted during the course of this investigation, I know that "AR10," "AR15," "LMT308" and "M1A" are types of semi-automatic firearms. I have also learned that "bbox" refers to a method of shipping goods from the United States to the Philippines known as "balikbayan box."

55.   On March 9, 2012, the defendant REX G. MARALIT sent an email to the defendant ARIEL MARALIT attaching a form titled "Shipper's Export Declaration" from a shipping company in New Jersey dated February 19, 2012 indicating that a parcel was shipped from "Rex Maralit" to "Ariel Maralit" in the Philippines. The contents of the parcel are described as "television."

56.   Based on bank records, I learned that a check was drawn on the defendant REX G. MARALIT's bank account in the amount of $130.00, payable to Five Star RP Sea Cargo, Inc., on February 20, 2012, referencing "Balikbayan Box 84765," which corresponds to the document described above.

C.   P.S.A. 5.56mm Semi-Automatic Rifle and Accessories

57.   On November 8, 2012, an online user in the Philippines placed an order with a U.S.-based firearms supplier and manufacturer for a P.S.A. 5.56mm semi-automatic rifle (the "P.S.A. rifle") for $799.00.   The buyer placed the order from an IP address in the Philippines, using the buyer name "Rex Maralit"

and an address in New Jersey. The buyer received confirmation of the order at an email address registered to the defendant ARIEL MARALIT.

58. On December 13, 2012, the defendant REX G. MARALIT sent contact and license information for the Pennsylvania FFL to the P.S.A. rifle supplier. The Pennsylvania FFL received the P.S.A. rifle on December 19, 2012.

59. In connection with this transaction, the Pennsylvania FFL informed the defendant REX G. MARALIT that it could not ship the P.S.A. rifle to a New York state resident due to pending changes in laws governing firearms transfers. On February 7, 2013, the defendant WILFREDO MARALIT sent an email to REX G. MARALIT providing the name and address of an FFL in Arkansas (the "Arkansas FFL") and stating, "Inside the box should have my name and address." WILFREDO MARALIT instructed REX G. MARALIT to provide parcel tracking information so he could "notify [his] FFL buddy." On February 8, 2013, REX G. MARALIT instructed the Pennsylvania FFL, in substance and in part, to ship the P.S.A. Rifle to the Arkansas FFL under the name WILFREDO MARALIT.

60. On February 8, 2013 the defendant WILFREDO MARALIT sent an email to the Arkansas FFL advising that a P.S.A. rifle would be arriving from "a dealer in PA." The P.S.A. rifle

27

arrived at the Arkansas FFL on February 15, 2013.  The Arkansas
FFL subsequently shipped the P.S.A. rifle to an FFL in
California, from which WILFREDO MARALIT took possession of the
rifle on March 5, 2013.

      D.    <u>The SCAR Rifle Transactions</u>

          i.   <u>The Flat Dark Earth SCAR Rifle Transaction</u>

      61.  On May 4, 2012, ARIEL MARALIT sent an email to REX
G. MARALIT with the subject "Re: lmt or scar" with web links to
two firearms broker websites.  Based on my experience and my
research in this case, I know that "LMT" is a brand of military
style semi-automatic rifle and that "SCAR," or "Special
Operations Combat Assault Rifle," is a type of military rifle
designed and manufactured by FN Herstal.  According to the
manufacturer's website, the SCAR is chambered in 5.56mm and
7.62mm (.308 caliber), and was designed in 2004 in response to a
solicitation from the United States Special Operations Command
for a new family of assault rifles to be used by U.S. Special
Forces.  The "FDE" variant of the SCAR is manufactured in a "Flat
Dark Earth" color scheme.  SCAR rifles are also available in
black.

      62.  On May 6, 2012, ARIEL MARALIT sent an email

to REX G. MARALIT with the subject "cheapest scar n available,"
and attached a web link to a product at the "HK Specialist"
store.  HK Specialist is an FFL located in South Carolina, which
has a website that promotes sales of military style firearms and
firearms accessories.

      63.  On June 21, 2012, REX G. MARALIT sent an email to
HK Specialist asking, "do you have a scar 17 FDE in stock
available to ship? please advise asap tnx."  On the same date, a
representative of HK Specialist responded, indicating that they
had "one left."  Later that day, REX G. MARALIT requested that HK
Specialist hold the item until the following Monday, assuring
that he would purchase the rifle on that date.  REX G. MARALIT
then asked, "One other question do you give discounts to LEO, I
am an active PO with the NYPD, please advise."  Based on my
training and experience, I understand "LEO" to mean "Law
Enforcement Officer" and "PO" to mean "Police Officer."

      64.  On July 1, 2012, ARIEL MARALIT sent an email to
REX G. MARALIT with the subject heading "charlie new order."  In
the email, ARIEL stated, among other things, "charlie orders" and
listed five weapons including "Scar 17 fde from gunbroker at
us2700."  Attached to the July 1, 2012 email was a web listing
for a SCAR rifle.

      65.  On July 6, 2012, REX G. MARALIT received an email

29

from HK Specialist indicating that his order of "1 FN SCAR 17 308 FDE" in the amount of $2,444.00, including shipping, had been approved.  That same day, REX G. MARALIT forwarded the email from HK Specialist to ARIEL MARALIT.

66.  On July 7, 2012, HK Specialist requested a copy of REX G. MARALIT's identification.  HK Specialist also sent an email to REX G. MARALIT, indicating, "NEED FFL."  That same day, REX G. MARALIT sent an email to HK Specialist attaching a copy of the Pennsylvania FFL's license.

67.  On July 12, 2012, WILFREDO MARALIT sent an email to REX G. MARALIT, forwarding the Federal Express tracking information for a parcel from HK Specialist, indicating that it was shipped from HK Specialist on July 10, 2012 and had arrived at the Pennsylvania FFL on July 12, 2012.

68.  On July 19, 2012, REX G. MARALIT took possession of a SCAR 17 FDE rifle from the Pennsylvania FFL.

ii.  <u>The Black SCAR Rifle Transaction</u>

69.  On July 6, 2012, REX G. MARALIT sent an email, via the online firearms broker GunsAmerica, to Discount Guns Inc., an FFL in North Miami Beach, Florida, regarding an "FNM SCAR 17S SA RFL 308 20R B," listed at $2,599.00, and asked whether the seller gave discounts to law enforcement officers.  The seller indicated

30

that he would consider offering such a discount, and requested
that REX G. MARALIT call him "so we can piece it all together."

70. On July 7, 2012, REX G. MARALIT sent information
for the Pennsylvania FFL to Discount Guns, Inc.  That same day,
REX G. MARALIT received an email from Discount Guns, Inc.
indicating that his credit card payment had been approved for the
"FNM SCAR 17s RIFLE 308 20R BLK," in the amount of $2,599.00.

71. On July 13, 2012, Discount Guns, Inc. emailed REX
G. MARALIT the tracking number for a SCAR 17S rifle. That same
day, REX G. MARALIT forwarded this email to ARIEL MARALIT.

72. On July 19, 2012, REX G. MARALIT took possession
of a SCAR 17S rifle from the Pennsylvania FFL.

73. On July 22, 2012, ARIEL MARALIT sent an email
to REX G. MARALIT with the subject line "Re: EMS," and included a
list of firearms parts, including "2-adjustable buttstock for
scar blk/fde" and "2-complete lower assembly for scar 17
blk/fde."

74. On November 6, 2012, ARIEL MARALIT sent an email
to REX G. MARALIT with the subject line "oct-nov '12 updated'"
which identified a pending shipment, recent orders and pending
orders.  Included in the pending shipment were a "scar 17 blk

lower n accsry (bbox2) and scar 17 fde w accry (ems upper/bbox2 lower)."

75.  On November 27, 2012, ARIEL MARALIT sent an email to REX G. MARALIT with the subject "instructions," which addressed "EMS box 1," "EMS box 2 (departs 3 days after)" and "BBOX."  Included in the list for "EMS box 2" is "1 scar 17 fde upper."  Included in the list for "BBOX" is "scar 17 2pcs lower." Based on my training and experience, I understand "upper" and "lower" to refer to the upper and lower receiver components of the rifles, respectively.

iii.  Shipments Through JFK

76.  On December 7, 2012, REX G. MARALIT sent an email (the "December 7, 2012 email") to ARIEL MARALIT attaching documents, including a United States Postal Service declaration form, indicating that a parcel was sent from an individual named "Mark Swanson" at an address in New Jersey.  The declaration form showed that the parcel was sent to "Dennis Menguito" at 19 P Gomez Street, 1600 Pasig City, Philippines.[3]  The weight of the parcel was listed as "44 pounds," with a total purported value of "500."  Under "Declared Description of Contents," the form listed

_____

[3]  On April 11, 2012, ARIEL MARALIT sent an email to REX G. MARALIT with the subject "New address," providing the following information: "Dennis menguito, 19 p. Gomez st. Pasig, metro manila, Philippines."

"aluminum side door railing," with a quantity of "5."  ARIEL
MARALIT forwarded the December 7, 2012 email with the attached
postal declaration form to a customer.

77.  On December 15, 2012, REX G. MARALIT forwarded
the tracking information to the customer, which indicated, among
other things, that the above-referenced parcel was processed
through a mail facility at JFK on December 8, 2012 and arrived in
the Philippines on December 15, 2012.

78.  On December 23, 2012, REX G. MARALIT sent an email
to ARIEL MARALIT attaching documents, including another United
States Postal Service declaration form, indicating that another
parcel had been sent from an individual named "Mark Swanson,"
this time at an address in New York, New York, which is the
address of the Manhattan Municipal Building near the headquarters
of the New York City Police Department at One Police Plaza.  The
declaration form again indicated that the parcel was sent to
"Dennis Menguito" in the Philippines.  Like the previous form,
the weight of the parcel was listed as "44 pounds," with a total
purported value of "500."  Under "Declared Description of
Contents," the form again listed "aluminum side door railing,"
with a quantity of "5."  U.S. Postal records indicate that the
above referenced parcel was also processed at a mail facility at

JFK, and subsequently exported from JFK airport to the
Philippines.

E.   DDTC Certified License Determinations

79.   On July 23, 2013, I received a Pre-Trial
Certification Letter from the DDTC indicating that rifles of (1)
.50 caliber, such as the Barrett rifle; (2) .30 caliber, such as
the Remington rifle and the SCAR rifles; and (3) 5.56mm, such as
the P.S.A. rifle, are all defined by the ITAR as defense articles
of the nature described in Category I(a) of the USML.   In
addition, I received a Pre-Trial Certification Letter from the
DDTC indicating that 5.7mm handguns, such as the FN Herstal 5.7mm
pistol, are defined by the ITAR as defense articles of the nature
described in Category I(a) of the USML.   While Pre-Trial
Certification Letters are still pending with respect to PS90
magazines, C-mags and other firearms accessories exported by the
defendants, these items appear to me, based on my training and
experience, to fall within the meaning of Category I of the USML,
as set forth above.

F.   Export License Checks

80.   I have been advised that, based on a search of
DDTC records, neither the defendants REX G. MARALIT, ARIEL
MARALIT or WILFREDO MARALIT, nor any of the other individuals
involved in the export scheme with the defendants possessed a

34

license from the State Department to export firearms from the United States.[4]

G.   FFL License Search

81.   I have been advised that, based on a search of ATF records, the defendants REX G. MARALIT, ARIEL MARALIT and WILFREDO MARALIT are not licensed importers, licensed manufacturers or licensed dealers of firearms.

---

[4]   In an email dated August 14, 2009, one of the defendants' associates emailed the defendant ARIEL MARALIT a copy of an "indentor's permit," noting "if the permit is not enough we can always make follow up on what is still needed on their part in order to export here." Attached to the email is a PDF of a document, apparently issued by government authorities in the Philippines, titled "License to Operate," with an effective date of July 15, 2009 and expiration date of July 14, 2011. The document purports to be a license to "deal in firearms, ammunition, spare parts & accessories" in the Philippines. The license does not purport to authorize the export of USML articles from the United States to the Philippines. In addition, the license was "non-transferable" and did not list the defendants REX G. MARALIT, ARIEL MARALIT or WILFREDO MARALIT as licensees.

III. <u>REQUEST TO SEAL</u>

      82.  Because public filing of this document could result in a risk of flight by the defendants as well a jeopardize the government's ongoing investigation, your deponent respectfully requests that this complaint be filed under seal, until the time of arrest, at which time the complaint shall be unsealed.

*     *     *

      WHEREFORE, your deponent respectfully requests that arrest warrants be issued for the defendants REX G. MARALIT, ARIEL MARALIT and WILFREDO MARALIT so that they may be dealt with according to law.

 

                          STEVEN R. GOODMAN
                          Special Agent, HSI

Sworn to before me this
September 3, 2013

HONORABLE VERA M. SCANLON
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

36